SN. Darth R. BENNETT, MMFN. Donald M. Mallay, SS. Steven Pacheco, ETN. Steve E. Ramseyer, and OMSN. Allen W. Volz, Petitioners,

v.

D. C. TARQUIN, Commander USN, as commanding officer USS Thomas A. Edison (SSBN610) (Blue), and Department of the Navy, Respondents.

Civ. No. 78–0219.

United States District Court,
D. Hawaii.

Feb. 22, 1979.

Steven J. Rosenberg, Steven J. Trecker, Kailua, Hawaii, for petitioners.

Stanley D. Tabor, Asst. U. S. Atty., Walter M. Heen, U. S. Atty., Dist. of Hawaii, Honolulu, Hawaii, for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

This case commenced on June 19, 1978, as a petition for writ of habeas corpus, writ of prohibition and declaratory judgment, on behalf of seven sailors attached to the USS THOMAS A. EDISON (SSBN610) (BLUE), against their commanding officer. The case was consolidated with Civil No. 78–0215, a similar case on behalf of ten other sailors.

On June 30, 1978, I granted the writ in 78–0219 as to three of the petitioners, on the authority of *Schroth v. Warner,* 353 F.Supp. 1032 (D.Hawaii 1973), and *Redmond v. Warner,* 355 F.Supp. 812 (D.Hawaii 1973). Respondent filed on September 11, 1978, a notice of appeal from the order entered on July 3, 1978, as to two of these petitioners, but stipulated to a dismissal of this appeal on October 11, 1978. The case became moot as to the third petitioner.

As to the other four petitioners, the requested writs were denied pending exhaustion of remedies within the military, but I retained jurisdiction for such further proceedings thereafter as might be appropriate.

On January 3, 1979, an amended petition for writ of mandamus and declaratory judgment was filed on behalf of the four remaining petitioners in 78–0219 plus one of the petitioners (Allen W. Volz) in 78–0215, against the commanding officer and the Department of the Navy.

The original petition had sought to obtain the release of petitioners from restrictions imposed at a captain's mast on June 15, 1978 (for violations of UCMJ Article 92, 10 U.S.C. § 892), a prohibition against the execution of the punishment imposed at that captain's mast, a declaration that the non-judicial punishment permitted by Article 15 of the Uniform Code of Military Justice, 10 U.S.C. § 815 was unconstitutional, and relief ancillary to these prayers.

By the time of the amended petition, the non-judicial punishment imposed on June 15, 1978, had been executed. The most severe punishment had been 60 days restriction to Ford Island, reduction to next inferior grade, and a fine of $300 (payable $150 per month for two months). The least severe punishment had been 30 days restriction to Ford Island. (As an ancillary consequence, each accused found to have violated Article 92 was automatically processed administratively out of nuclear submarine duty.) Thus the case against their commanding officer had become moot (except for the as yet unresolved prayer for costs and attorney's fees).

This leaves for determination the prayers of the amended petition for a declaration that Article 15 of the Uniform Code of Military Justice is unconstitutional as written or as applied, or a declaration that the non-judicial punishment meted out was imposed in violation of regulations and Constitutional protections, with appropriate orders expunging all records of the punishment and reinstating petitioners to nuclear submarine duty with back pay and allowances, costs of suit, and attorney's fees.

## UCMJ ARTICLE 15

■ UCMJ Article 15 (10 U.S.C. § 815) permits a commanding officer to impose non-judicial punishment in order to maintain discipline. The Article prohibits the use of this kind of punishment if the person accused has demanded trial by court-martial before the imposition of the non-judicial punishment, "except in the case of a member attached to or embarked in a vessel."

Petitioners' timely demands for trial by court-martial were denied under this excep-

tion. Petitioners argue that the exception is unconstitutional, or alternatively that they were not attached to or embarked in a vessel.

The Constitutionality of authorizing a Captain's Mast to be held over the objection of the accused was upheld in this district by Judge Pence in *Gibson v. Warner,* Civil No. 74–14 (D.Hawaii 1974). He said there, and I agree, that:

> Congress considered the Captain's Mast procedure and in instituting the same, attempted to establish a balance of interest between the parties, the military and the individual. The Court finds that the balance of interest reached by Congress was reasonable; that the underlying justification for non-judicial punishment by way of Captain's Mast is necessary to meet the exigencies for shipboard discipline; . . . and that the plaintiff was not denied due process.

██ Petitioners' alternative argument, that they were not attached to or embarked in a vessel, requires further exposition of the undisputed facts.

Petitioners were members of the BLUE CREW of the USS THOMAS A. EDISON. Respondent TARQUIN was the commanding officer of the BLUE CREW.

Petitioners were subjected to Captain's Mast proceedings at Ford Island, Pearl Harbor, on June 15, 1978. At that time, the submarine on which they had been embarked was in Guam, under the control of a separate and distinct crew called the GOLD CREW, commanded by a different commanding officer. Petitioners were quartered at Ford Island, training and preparing for their next turn to relieve the GOLD CREW and to take over the USS THOMAS A. EDISON. The charges for which they faced Captain's Mast involved wrongful possession and use of marijuana aboard the vessel during August 1977 (as to Pacheco), wrongful possession and use of marijuana at Navy Housing, Pearl Harbor during January 1978 (as to Bennett), wrongful possession and use of marijuana at 1400 Series, BEQ, Pearl Harbor during January 1978 (as to Volz), wrongful possession, use, and transferring of marijuana aboard the the vessel during February 1978 (as to Mallay), and wrongful possession and use of marijuana aboard the vessel during February 1978 (as to Ramseyer). Petitioners do not argue that these are not minor offenses within the purview of Article 15. *Cf. Hagarty v. United States,* 449 F.2d 352, 196 Ct.Cl. 66 (1971) (requirement of statute that offenses be "minor" is jurisdictional).

Thus, at the time of the Captain's Mast, petitioners were all ashore in Hawaii and not embarked in a vessel. Were they nevertheless attached to a ship?

I am persuaded by respondents' argument that they were.

*Jones v. Frudden,* Civil No. 74–2273 (N.D. Cal. November 22, 1976), reported at 4 Mil. L.Rep. 2606, presented a similar issue. There a petty officer was assigned to the USS GRIDLEY which was undergoing repairs at the Hunters Point Naval Shipyard in San Francisco. He was taken before a Captain's Mast and charged with insubordination. His request for a court-martial was denied on the basis that he was attached to a vessel. He was reduced in grade and forfeited one-half a month's pay. His petition to the district court was dismissed, the court holding that neither the legislative history nor statutory language supported the thesis that a ship must be at sea for the commanding officer to have the authority to refuse a request for trial by court-martial by personnel assigned to the ship and under his command. The discussion by Judge George B. Harris, which I adopt here, details the legislative history and proper interpretation of Article 15.

Here the removal from a vessel at sea is more remote. Yet the concept of being attached to a vessel remains valid. The argument is well stated in the government's supplemental memorandum filed on February 16, 1979.

> As noted in the Government's previous Memorandum filed in this case, the Petitioners were members of the "Blue Crew" of the USS THOMAS A. EDISON, a nuclear-powered ballistic missile submarine.

Because of its unique mission in the Navy, that of strategic deterrence of a potential aggressor nation, it is necessary for the ship to be at sea almost continuously year-round. While technological advances have enabled us to build ships that can withstand such constant use, the necessity of manning these ships with efficient, trained crews precludes putting assigned personnel through the same stresses as the vessels. Even if it were physically possible to keep a crew at sea almost continuously, the morale implications would mandate some relief. Hence the concept of "Blue" and "Gold" crews was developed in order to meet the special needs of these ships and their missions.

When attached to the "Blue Crew" of a ship such as the USS THOMAS A. EDISON, a sailor is on sea duty as opposed to shore status for the entire time he is assigned to the vessel (to the same extent that a surface ship sailor is still attached to a vessel while in port). Moreover, the following factors also indicate his sea status:

A. Assignment orders show the sailor's official military address as the ship;

B. The sailor draws submarine pay for the entire time he is attached to the vessel, whether in on or off crew status; though sea pay is changed to commuted rations during off-crew status, this is done in order to provide more subsistence funds when the crew must buy meals ashore;

C. Pro-rata living expenses while in an off-crew status are tax deductible, being ruled temporary duty by the Internal Revenue Service. Even where crew members live in government or private homes ashore, such homes have been ruled to be temporary, away from their permanent home aboard ship. Armed Forces Tax Guide, NAVSO–P 1983;

D. During the first part of off-crew status after returning from patrol, the sailors are afforded a liberal liberty policy; afterward, the crew deals with matters of the ship's administration, culminating in the latter phase with intensive refresher training to prepare for the next patrol;

E. All off-crew personnel are subject to instant recall to their ship as a replacement for their on-crew counterpart, if such action is necessary for the accomplishment of the ship's mission;

F. At no time does the administration of discipline over the off-crew fall upon a person other than the Commanding Officer;

G. Sailors assigned to a two-crew nuclear submarine are administratively credited with a full sea tour, notwithstanding the fact that a significant percentage of the tour is spent in off-crew status.

The foregoing indicia of attachment show that assignment to a vessel of the unique class to which the USS THOMAS A. EDISON belongs, is being "attached to a vessel." The fact that the vessel is capable of continuous use, thereby requiring assignment of two crews instead of the normal one, does not negate the burden on each Commanding Officer to maintain the efficiency and discipline of his crew, to insure a high state of readiness. Nothing in the legislative history would indicate that it was Congressional intent to alter this responsibility of command.

## THE CAPTAIN'S MAST

Petitioners attack the conduct of the Captain's Mast held on June 15, 1978. They contend that the resulting non-judicial punishment was imposed in violation of the Manual for Courts Martial (1969, Rev.), the Manual of the Judge Advocate General of the Navy, and the provisions of the United States Constitution regarding equal protection and due process of law. Their claims relate to five allegations of misconduct:

(1) That the commanding officer considered a statement by David Cannon, another member of BLUE CREW, even though Cannon refused to testify at the Captain's Mast and objections to the statement being used in evidence were sustained by the commanding officer;

(2) That the commanding officer actively participated in soliciting and procuring a prosecution witness to testify, thereby impermissibly assuming the role of both judge and prosecutor;

(3) That the commanding officer erroneously applied a standard of proof less than "beyond a reasonable doubt" for his findings;

(4) That petitioners were denied the effective assistance of a personal representative because of the commanding officer's denial of a reasonable continuance to allow adequate preparation for the Captain's Mast;

(5) That the evidence in each case did not support the findings.

 I find that the evidence in each case was more than sufficient to support the charge. Each case depended upon the testimony of one witness, Petty Officer Cronk, another member of BLUE CREW, who stated from personal knowledge that he personally observed the violation charged. Each accused denied the charge. That was the sum and substance of the evidence on the merits. It is not for me to determine credibility or to substitute my judgment for that of the commanding officer.

 Petitioners' claim that they were denied effective assistance of a personal representative is not supported by the record. The sequence of events was that the commanding officer received written statements regarding marijuana usage from Cannon and Cronk on or about April 4, 1978. About May 14, 1978, petitioners were informed of the charges against them (based on the April statements). The next day or so, petitioners retained civilian counsel to defend them. Later, the commanding officer was informed by Navy legal officers that the written statements alone were insufficient; the informants would have to testify. Both declined to do so. Therefore, on May 22, 1978, the charges were withdrawn. The commanding officer then went on leave to the mainland. Upon his return, his executive officer informed him that Cronk would testify. The charges were then reinstated on June 12, 1978, with the

mast scheduled for the following day. At petitioners' request, mast was postponed to June 15, 1978. Requests for further continuances were denied. Only Cronk testified. Counsel for petitioners were permitted to interview him for approximately an hour. The issues were uncomplicated. Aside from the bare assertion that they should have had more time to prepare, petitioners have failed to show, or even allege, in what way they were prejudiced.

 Further, I find that the commanding officer did in fact apply a standard of proof beyond a reasonable doubt. He did in fact give one accused the benefit of the doubt and dismissed the charge as to him. This was notwithstanding the government's contention that for non-judicial punishment under Article 15 the test is only a preponderance of the evidence.

The nature of a Captain's Mast is such that the commanding officer is necessarily involved at every stage of the proceedings. He makes the decision whether a mast shall be held. He knows what the charges are to be and what evidence is going to be available to support the charges. He holds the mast, decides whether a violation has been proven, and imposes the punishment. He may decide not to present the matter before a mast. He may confront an informant or complainant to determine the bona fides of the charge and whether settlement short of a mast is appropriate. He has the responsibility for the morale and discipline of his crew. With this responsibility goes the duty to follow up on any alleged violations of the UCMJ that come to his attention.

There may be a Constitutional line beyond which a commanding officer may not step in pursuing matters which will come before him at mast. The petitioners did not show anything more than conversations between the commanding officer and Cronk or Cannon to ask them to testify. I do not believe Cannon's testimony that the commanding officer offered Cannon $1000 to testify against petitioners. When Cronk and Cannon refused to testify, he ordered the charges withdrawn, and left town. When he returned, Cronk had already agreed to testify.

Petitioners' principal contention in this area is that the commanding officer "considered" Cannon's statement without providing it to petitioners, in violation of Paragraph 133(b)(4) & (5) of the Manual for Courts Martial 1969 (Rev.). The argument goes that because the commanding officer had read Cannon's statement, he necessarily had it in his mind when he came to considering all of the information presented at mast, even though Cannon did not testify and objections to his statement were sustained. Petitioners buttress this contention by pointing to the fact that the commanding officer asked each petitioner whether he had in fact committed the violation set out in Cannon's statement, although that violation was not before him for decision.

The commanding officer denies considering Cannon's statement. I believe him. Cannon's statement did not relate to the charges before him and was unnecessary to his findings. The argument is made that he used the double denial (of Cronk's statements and then of Cannon's statements) to judge petitioners' credibility, but this has nothing to do with Cronk's credibility. In passing, I note that petitioners called Cannon as their witness, and Cannon confirmed the incidents set forth in his statement as true.

Finally, as pointed out by the government, Paragraph 130 of the Manual for Courts Martial 1969 (Rev.) provides that procedural errors will not invalidate an Article 15 punishment "except to the extent that may be required by a clear and affirmative showing of injury to a substantial right of the person on whom the punishment was imposed, which right was neither expressly nor implicitly waived." No such showing was made.

## JURISDICTION

I have assumed that I could grant the declaratory and mandatory relief sought. *See* 28 U.S.C. § 1361; *Ashe v. McNamara*, 355 F.2d 277 (1st Cir. 1965); *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *cf. Jones v. United States*, 419 U.S. 907, 95 S.Ct. 190, 42 L.Ed.2d 150 (1974) (dissenting opinion of Douglas, J., detailing methods of attacking UCMJ convictions). But query whether petitioners must first seek relief from the Board of Correction of Naval Records pursuant to 10 U.S.C. § 1552. *See Hodges v. Callaway*, 499 F.2d 417 (5th Cir. 1974), *rehearing denied*, 503 F.2d 567 (5th Cir. 1974); *Correa v. Clayton*, 563 F.2d 396 (9th Cir. 1977). Also query whether reinstatement of petitioners to nuclear submarine duty is within the power of the district court to order under any circumstances. *See Sims v. Fox*, 492 F.2d 1088, *rehearing en banc*, 505 F.2d 857 (5th Cir. 1974), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975).

In view of the findings and conclusions above, I do not reach these issues.

## CONCLUSION

Judgment shall enter for respondents and against petitioners dismissing their petition and denying the requested writ of mandamus.

Petitioners whose petition for writ of habeas corpus was heretofore granted may make application upon notice for costs and attorneys' fees which will be considered by the court together with any objections thereto filed by respondents.

The foregoing constitutes the courts findings of fact and conclusions of law.