**UNITED STATES**

v.

**Michael H. FORESTER, 456 21 3615, Seaman (E–3), U. S. Navy.**

**NCM 79 1039.**

U. S. Navy Court of Military Review.

Sentence Adjudged 16 Oct. 1978.

Decided 19 Oct. 1979.

Baum, Senior Judge, concurred and filed opinion.

LT David S. Durbin, JAGC, USNR, Appellate Defense Counsel.

LT Christine M. Yuhas, JAGC, USN, Appellate Government Counsel.

Before BAUM, Senior Judge, and PRICE and MICHEL, JJ.

MICHEL, Judge:

The issue raised by appellant presents this Court with a case of first impression.

During the presentencing stage of his special court-martial, the prosecution was permitted, over defense objection, to introduce into evidence a document purporting to reflect that appellant had previously been punished by his commanding officer at a proceeding conducted in accordance with Article 15, Uniform Code of Military Justice (USMJ), 10 U.S.C. § 815, for the wrongful use of marijuana in violation of Article 92, UCMJ, 10 U.S.C. § 892, as being violative of Article 1151, *U. S. Navy Regulations, 1973.* Appellant at trial, as he does here, challenged the admissibility of this document, averring that, because at the time that this prior nonjudicial punishment was imposed appellant was a member of the precommissioning unit of the USS MEMPHIS (SSN–691), appellant should have been advised of his right to refuse punishment under Article 15, and that his punishment should not have been considered by the military judge in this case as a matter bearing on the appropriate punishment for appellant's present offenses. *See United States v. Booker,* 5 M.J. 238, 243–244 (C.M.A.1977). The linchpin for appellant's argument in support of his position is that since, at the time the non-judicial punishment at issue here was administered, appellant was not "attached to or embarked in a vessel," within the contemplation of Article 15, UCMJ, *see* paragraph 132, *Manual for Courts-Mar-*

*tial, 1969 (Rev.)*, the exception to a servicemember's right of removal to a judicial forum left intact by our judicial superiors, *see Booker, supra*, does not apply to him and thus his sentence should be set aside. *See also United States v. Booker*, 5 M.J. 246 (C.M.A.1978). Succinctly, appellant avers that, at the time his prior non-judicial punishment was imposed, the precommissioning unit of the USS MEMPHIS (SSN–691) was not "a vessel" as that term was contemplated by Congress when it enacted the statute.

The pertinent facts are not in dispute. Appellant's prior punishment was meted out by the commanding officer of the precommissioning unit[1] on 7 November 1977. On that date appellant's "unit," *see* Article 86, UCMJ, 10 U.S.C. § 886, was located at Newport News, Virginia; appellant had been assigned for duty there since 8 May 1977. As of 31 July 1977, appellant's duties consisted *inter alia* of practical training at sea to support his watchstander qualifications and of standing shipboard security watches with the responsibility for the water-tight integrity of the ship forward of its engineering spaces. As of the period immediately prior to 7 November 1977, appellant's duties were expanded to include standing watches as Petty Officer of the Deck in port and watchstanding as a sonar operator at sea during builder's trials. Also worthy of note is 3 April 1976, the date that the USS MEMPHIS (SSN–691) was launched, and 17 December 1977, the date that the ship was commissioned. The issue thus narrows to encompass the inquiry of whether or not a waterborne conveyance, intended for use by the U. S. Navy, which is launched but yet not commissioned, is a "vessel" within the ambit of Article 15, for if it is then appellant's contention must fail. *See United States v. LeColst*, 4 M.J. 800 (N.C.M.R.1978); *United States v. Penn*, 4 M.J. 879, 881–883 (N.C.M.R.1978). *See also United States v. Nordstrom*, 5 M.J. 528 (N.C.M.R.1978).

Sixty years ago, Mr. Justice Pitney, writing for an undivided Court in a case dealing with asserted admiralty jurisdiction over a contract dispute wherein the basic claim was for recovery of a balance claimed to be due for work, labor, material, and related services furnished to repair the steamship Yucatan, paused to note that:

> '[A] ship is born when she is launched, and lives so long as her identity is preserved. Prior to her launching she is a mere congeries of wood and iron—an ordinary piece of personal property—as distinctly a land structure as a house, and subject to mechanics' liens created by state law enforceable in the state courts. In the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction.' *Tucker v. Alexandroff*, 183 U.S. 424, 438, 22 S.Ct. 195, 46 L.Ed. 264, 270.

*North Pacific Steamship Company v. Hall Brothers Marine Railway & Shipbuilding Company*, 249 U.S. 119, 127, 39 S.Ct. 221, 63 L.Ed. 510 (1919). Later, Mr. Justice Butler addressed the question of whether a wharf boat which had sunk in a river causing damage to the merchandise which had been placed thereon was, as respects admiralty jurisdiction, a "vessel" at the time it sank. Answering that question in the negative, that jurist noted several dispositive factors, among which were that the wharf boat was not capable of being used as a means of transportation; that the various water, power, and telephone systems linked between the boat and the adjacent city evidenced a permanent location; and that the boat performed no function that could not have been also suitably performed by an appropriate structure on land. *Evansville & Bowling Green Packet Company v. Chero Cola Bottling Company, et al.*, 271 U.S. 19, 22, 46 S.Ct. 379, 70 L.Ed. 805 (1926). Other federal courts have, on occasion, conducted exhaustive inquiries into the same matter, in the main seeking to define the ebb and flow of admiralty jurisdiction for the ulti-

---

**1.** Upon commissioning of the USS MEMPHIS (SSN–691), this officer acceded to the status of the submarine's commanding officer with all duties, responsibilities, and privileges pertaining to that office.

mate resolution of civil law disputes. Most noteworthy is *Charles Barnes Company v. One Dredge Boat, et al.,* 169 F. 895 (E.D.Ky. 1909) (collecting cases), wherein it was held that a vessel is a navigable structure used or intended for transportation. *Id.* at 896–897. Unfortunately, these definitions are applicable to statutes and issues other than 10 U.S.C. § 815.

The federal judiciary has not labored alone in its quest for an adequate definition of the term at issue here. Congress, in enacting legislation dealing with myriad facets of this nation's maritime interests, has established varying definitional criteria for specific individual purposes. However, for general purposes, the word "vessel" includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water. 1 U.S.Code § 3.[2] This definition has been judicially expanded to include entities which are "practically capable" of such use. *Petition of Kansas City Bridge Company,* 19 F.Supp. 419 (D.C.Mo.1937). Further modification was engrafted in *M/V Marifax v. McCrory,* 391 F.2d 909 (5th Cir. 1968), where, construing 1 U.S.C. § 3 in a suit to enforce a maritime lien under 46 U.S.C. § 971,[3] it was held that a ship which, although not actually employed in navigation or engaged in commerce, was nonetheless not navigably impotent and was capable of being used in navigation, was a "vessel" for codal purposes, *citing Pleason v. Gulfport Shipbuilding Corporation,* 221 F.2d 621 (5th Cir. 1955). Again, unfortunately, these definitions do not fit the precise issue presented here.

It is considered that the definition of the term "vessel" in 1 U.S.C. § 3 is applicable to other legislation affecting the naval service unless otherwise expressly indicated in the pertinent statute or regulation.[4] That term is defined in neither Article 15, UCMJ, nor in paragraph 132, *Manual for Courts-Martial, 1969 (Rev.).* Also significantly absent is any reference to the term's meaning in those discussional sessions which preceded enactment of the UCMJ in 1950, the amendment to Article 15 in 1962, and the promulgation of the *Manual* in 1951 and 1969.[5] The only plausible explanation is that those involved with the legislative and executive processes culminating in the creation of Article 15 and paragraph 132 were specifically aware of the general definition contained in 1 U.S.C. § 3, as judicially modified, and applied that definition to the matters at hand. *See* 10 U.S.C. § 101. The question thus becomes: When is a watercraft, newly constructed for the Navy, practically capable of being used in navigation as a means of transportation on water?

 From the foregoing, it would be difficult, if not impossible, to conclude other than that a ship commissioned into the service of the U. S. Navy is, at all times, a "vessel" for Article 15 purposes. Similarly, such other fully operational ships as may come under the jurisdiction of the Department of the Navy in time of war should be considered "vessels" for Article 15 purposes.[6] Further examination is required, however, because the maritime entity at the focus of this discussion was not yet commissioned on the peacetime date that the Article 15 punishment complained of here was administered. Keeping in mind the purpose

**2.** This language, without substantial change, was taken from an act of Congress passed in 1866 for the prevention of smuggling, 14 Stat. 178. It took effect in its present form, under Title 1 of the United States Code, as part of the Act of July 30, 1947, 61 Stat. 633. The language appears *verbatim* in KERCHOVE'S INTERNATIONAL MARITIME DICTIONARY 822 (1948), and in *U. S. Navy Regulations, 1973.*

**3.** Act of June 5, 1920, ch. 250, § 30, Subsec. P, 41 Stat. 1005.

**4.** *See* JAG Opinion, JAG:202.2:JRB:dc, Ser: 4755 of 5 June 1973.

**5.** *See, e. g.,* Hearings Before Committee on Armed Services, H.R. 2498, 81st Congress, 1st Session (1949); Senate Reports, Report No. 1911, 87th Congress, 2d Session, Vol. 19 (1962); Hearings Before Committee on Armed Services, H.R. 7656, 87th Congress, 2d Session, Book 2 (1962).

**6.** *See,* Note to Art. 2(10), UCMJ, 10 U.S.C. § 2(10).

sought to be achieved by the exemption clause ·in Article 15, see United States v. LeColst, supra at 802, and United State v. Penn, supra at 883, ascertaining the precise state of readiness for sea of the USS MEMPHIS (SSN–691) is prerequisite to the resolution of the issue at bar.

Current practice indicates that a new conventionally powered surface ship or submarine is commissioned at or shortly after the date of delivery to the Navy; nuclear powered surface ships and submarines, such as the USS MEMPHIS (SSN–691), are normally placed "in commission" concurrent with delivery by the builder to the Navy. This status signals approximate readiness for the performance of all mission requirements. See OPNAVINST 9080.3E of 7 August 1972. Further, nuclear powered surface ships and submarines in construction normally are assigned to an active status of "in service"[7] when they are ready for sea. This usually occurs prior to underway builder's trials[8] and during the period beginning approximately two weeks before commencement of the first sea trials and ending with delivery of the ship. See id. At this time the prospective commanding officer, who is also commanding officer of the precommissioning unit, becomes officer-in-charge of the ship. Id. Another similar category, "in commission, special," applies to all other new ships, except non-nuclear submarines, at the point at which the ship, although not yet commissioned, is capable of underway operation. See OPNAVINST 4700.8F of 24 June 1972. About two months prior to delivery and prior to the first underway builder's trial, a non-nuclear submarine undergoing construction is placed "in commission"/"in service," depending upon whether construction takes place in a private or naval shipyard. See id.

The purpose to be served by the exception clause of Article 15 is justified by a number of factual conditions relating to the state of operational readiness of an expectant commissioned surface ship or submarine of the U. S. Navy. These factors are best marshalled by consideration of the status category assigned by the Chief of Naval Operations or his designee and obtaining at the time of the imposition of summary punishment under the auspices of Article 15. Perforce, an ad hoc approach must be utilized to determine the overall state of affairs which, although it does not facially delineate individual criteria, see Relford v. Commandant, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971), nonetheless embraces an analytical balancing of these criteria. See United States v. Moore, 1 M.J. 448 (C.M.A.1976). Thus, when, as here, a question arises as to the applicability of the exception clause of Article 15 to a member of a precommissioning unit, the touchstone for resolution shall be whether the Chief of Naval Operations or his designee has assigned the ship or submarine one of the following status categories:[9]

1. "In service," as respects nuclear surface ships and submarines.

2. "In commission, special," as respects non-nuclear surface ships.

3. "In commission"/"in service," as respects non-nuclear submarines, as appropriate.

If such a category has been assigned, then the servicemember attached to or embarked in that surface ship or submarine, see par. 132, Manual for Courts-Martial, 1969 (Rev.), has neither the right to refuse punishment under Article 15, nor standing to complain that documentary evidence memorializing

---

7. This is the same category into which naval ships and ships of the Military Sealift Command (MSC) are placed which are being utilized in an active fleet supporting role. See OPNAVINST 4700.8F of 24 June 1972.

8. Builder's trials are evaluation trials and inspection conducted underway by the builder for the purpose of assuring the builder and the Navy that the ship is, or will be, ready for acceptance trials, and should be a comprehen-

sive test of all ship's equipment, and which should approximate the scope of the acceptance trials. See id.

9. These categories are not intended to be all-inclusive in that some other existing equivalent category may have escaped the notice of this Court or may be created and duly assigned in the future by the Chief of Naval Operations or his designee.

that proceeding is unlawfully admitted as sentence aggravating matter at a subsequent judicial proceeding in violation of *United States v. Booker, supra.*

In the case at bar, no direct evidence appears of record indicating whether, on 7 November 1977, the Chief of Naval Operations of his designee assigned the status category or "in service" to the nuclear submarine USS MEMPHIS (SSN–691). However, there is clear evidence that, prior to imposition of Article 15 punishment on that date, appellant had functioned aboard as a sonar operator during builder's trials. Additionally, and of equal import, other specific evidence establishes that on or before 7 November 1977 the commanding officer of the precommissioning unit had assumed the additional duties and responsibilities of officer-in-charge of the submarine. In sum, this circumstantial evidence [10] convinces us that the status category of "in service" had in fact been assigned to appellant's ship prior to the imposition of his non-judicial punishment and thus that ship was a "vessel" for Article 15 purposes on 7 November 1977.

To reiterate, commissioned ships of the U.S. Navy are clearly "vessels" for Article 15 purposes, as are newly constructed ships which have been duly designated "in commission, special," and "in service." What other watercraft as may be found within the definitional ambit of "vessel" under the statute must await an *ad hoc* determination appropriate to a future case or controversy.

Accordingly, the assignment of error is rejected. The findings of guilty and the sentence, as approved below, are affirmed.

Judge PRICE concurs.

BAUM, Senior Judge (concurring):

I agree with Judge Michel's conclusion that a nuclear submarine "in service" is a "vessel" as contemplated under Article 15, Uniform Code of Military Justice (UCMJ)

and I, too, am convinced that on 7 November 1977 the not-yet-commissioned MEMPHIS (SSN–691), a nuclear submarine, was "in service." [1] I think it should be made clear, however, that appellant's assertion concerning the precommissioning unit to which he had been assigned is correct. A precommissioning unit is not equivalent to a "vessel." Presumably, at some point those personnel assigned to the precommissioning unit became assigned to the submarine, either at the time it went "in service" or when it was commissioned. Unfortunately, there is no direct evidence in the record that establishes this fact. Circumstantially, from Prosecution Exhibit 9 and Defense Exhibit A we can reasonably infer that on 7 November 1977 appellant was assigned to MEMPHIS (SSN–691) rather than, or in addition to, the precommissioning unit; but, regardless of appellant's assigned unit, *i. e.,* the unit to which he was "attached," I believe the evidence is clear from his duties noted in Defense Exhibits C and D, which included standing shipboard security watches, petty officer of the deck watches, in port, and sonar operator watches, at sea, that appellant was "embarked in a vessel" for purposes of Article 15, UCMJ at the time he received nonjudicial punishment. I believe that such a determination is necessary because the precommissioning unit is not a "vessel" and if that was the unit to which appellant was assigned at the time punishment was imposed then we must find that he was "embarked in a vessel" in order for Prosecution Exhibit 1 to be admissible. I find that he was so embarked and, accordingly, consider the exhibit admissible.

10. *See* Prosecution Exhibit 1 and Defense Exhibit A, Record.

1. Prosecution Exhibit 9 and Defense Exhibit A both indicate that the prospective commanding officer had assumed the title of Officer in Charge, MEMPHIS (SSN–691) which reflects "inservice" status of the submarine pursuant to OPNAVINST 9080.3E of 7 August 1972.