KEATING, Judge:
The appellant pled guilty to six specifications of unauthorized absence in violation of Article 86, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 886 (1994). In its case in aggravation, the Government offered a record of prior nonjudicial punishment [NJP], pursuant to Article 15, UCMJ, 10 U.S.C. § 815 (1994), for an unauthorized absence of 16 hours and carrying two concealed weapons, a .357 magnum revolver and a .22 caliber automatic pistol. Prosecution Ex. 1. The defense objected to this record on the grounds that at the time the NJP was imposed by the Commanding Officer, USS CONSTELLATION (CV 64), the ship was in the naval ship yard in Philadelphia undergoing overhaul and was, therefore, not “an operational vessel.”
As a consequence, the defense maintained that the appellant had the right to refuse nonjudicial punishment and to speak to an attorney prior to deciding whether or not to refuse NJP.[1] The military judge overruled the objection holding that the decision in United States v. Yatchak, 35 M.J. 379 (C.M.A.1992), cited by the defense, applied only to the punishment of bread and water under Article 15(b), UCMJ, and not to the right to refuse nonjudicial punishment under Article 15(a), UCMJ. In his single assignment of error, the appellant now asserts that the language “attached to or embarked in a vessel” is identical in both Article 15(a) and (b) and that the legislative history and rationale applied by the U.S. Court of Military Appeals in dealing with the bread and water issue in Yatchak applies equally to the right to refuse NJP.
The Government concedes that Yatchak applies, but argues (1) that the mere fact that the ship was undergoing overhaul does not necessarily mean it was not in an operational status and (2) that the trial defense counsel failed to present or even offer any evidence to prove that essential fact. The Government urges this Court to hold that an accused has the burden of proving that the ship was not in an operational status when the NJP was imposed and that a U.S. Navy ship (or other watercraft in the service of the United States Navy) is presumed to be a vessel for NJP purposes absent proof to the contrary.
There is an analogous concept in admiralty law that lends some support to the Government’s position. To qualify as a seaman under the Jones Act, 46 U.S.C.App. § 688(a) (1988), a maritime employee must have a substantial employment-related connection to a vessel in navigation[2] Generally “a vessel *619 does not cease to be a vessel when she is not voyaging, but is at anchor, berthed or at dockside, even when the vessel is undergoing repairs.” DiGiovanni v. Traylor Bros., Inc., 959 F.2d 1119, 1121 (en banc), cert, denied, 506 U.S. 827, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992), quoted in Chandris v. Latsis, — U.S. -, -, 115 S.Ct. 2172, -, 132 L.Ed.2d 314 (1995). Vessels undergoing repairs or spending a relatively short time in dry dock are still considered to be “in navigation” whereas, ships being transformed through major overhauls or renovations are not, even though the ship’s use before and after the work will be the same. The question of whether a ship was “in navigation” during a particular period of time when the ship was in drydock is a question of fact for the jury to decide. Chandris, — U.S. at -,115 S.Ct. at-.
We have previously said that a ship commissioned into the service of the United States Navy is, at all times, a “vessel” for the purpose of imposing NJP.[3] United States v. Forester, 8 M.J. 560 (N.C.M.R.1979). We based this conclusion on the statutory definition of the term “vessel” as including every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water. 1 U.S.C. § 3 (1994). Courts that have construed the term “vessel” in analogous contexts almost uniformly have adopted the same definition. McCarthy v. The Bark Peking, 716 F.2d 130, 133 (1983), cert, denied, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984). The President has also expressly adopted this definition in the Manual for Courts-Martial. Rule for Courts-Martial [R.C.M.] 103(20).
The issue in Forester was whether a member of a precommissioning unit on a Navy ship was “attached to or embarked in a vessel” for the purpose of imposing NJP under Article 15, UCMJ. In dicta, we defined the issue as whether a waterborne conveyance intended for use by the U.S. Navy that is launched but not yet commissioned is a “vessel” within the meaning of Article 15. We said the “touchstone for resolution” was the status category assigned by the Chief of Naval Operations by which the Navy classified commissioned ships and other ships that, although not yet commissioned, are capable of underway operation. Forester, 8 M.J. at 564.
Since no direct evidence was introduced as to the status assigned the vessel on which the precommissioning unit was embarked, we resolved the issue based on circumstantial evidence that demonstrated the appellant was in fact performing duties aboard a “vessel” at the time he received NJP. Id. at 565 (Baum, S.J., concurring). The majority opinion restated our view that commissioned ships of the U.S. Navy are always “vessels” for Article 15 purposes, as are newly constructed ships that are duly classified. See U.S. Navy Regulations, art. 0406, Naval Vessel Register, Classification of Naval Craft, and Status of Ships and Service Craft.
Subsequent to the decision in Forester, the U.S. Court of Military Appeals[4] dealt with a series of cases involving the imposition of confinement on bread and water. Our superior court ultimately decided a case involving a crew member of a ship undergoing a long-term overhaul. Noting the Government and defense agreement that the ship “was never in an operational status” the Court held that the appellant was not “attached to or embarked in a vessel” as the phrase was used by Congress in Article 15, UCMJ. United States v. Yatchak, 35 M.J. 379, 381 (C.M.A. 1992). Reference was made in the majority opinion to “those at sea”, and to “those actually at sea as well as those in port when their ships were about to depart.” Id at 381. *620 Judge Wiss expressly disassociated himself from the limited construction of the phrase “attached to or embarked in a vessel,” which he characterized as dicta in the majority opinion. Id. at 381 (Wiss, J., concurring in the result).
The military judge below correctly noted that Yatchak addressed only the issue of whether an accused is attached to or embarked on a vessel for the purpose of confinement on bread and water. There are no reported decisions that have applied the Yatchak rationale to the imposition of nonjudicial punishment. This Court in Forester assumed that a commissioned ship of the U.S. Navy is at all times a “vessel” for the purpose of the imposition of nonjudicial punishment, and we did not consider the question of whether, subsequent to commissioning, events could change the status of a Navy ship so that for some interim period it would not be a “vessel” for NJP purposes. The question, however, has been addressed elsewhere. See Bennett v. Tarquin, 466 F.Supp. 257 (1979); Jones v. Frudden, Civil No. 74-2273GBH (N.D.Cal. Nov. 29,1976), reprinted in 4 Mil.L.Rep. 2605 (Pub.L.Educ.Inst. Sep.Dec. 1976).
In 1973, the USS GRIDLEY was docked and undergoing repairs at Hunters Point Naval Shipyard in San Francisco, California. A petty officer charged with insubordination was taken to Captain’s Mast (nautical parlance for NJP) despite his request for trial by court-martial. His appeal through military channels was denied, and he sought relief before the Federal District Court, contending that the phrase “attached to or embarked in a vessel” has reference to seagoing operations or short stop-overs in port, but not where the ship had been at anchor for some time and where shore based administrative facilities, including legal services, were readily available. Jones, 4 Mil.L.Rep. at 2606.
The Government argued in Jones that the plaintiffs assignment to an active-duty vessel preparing to voyage placed him within the “attached to” language of Article 15(a), UCMJ. The District Court considered congressional hearings and floor proceedings and found them not to be definitive, noting that the measure had not been controversial, and concluded that the broad language used did not suggest that the exception applied only to ships at sea, or that the “unique responsibilities of the ship’s captain” are not present even when the ship is in port. Id. at 2607.
A few years later, another U.S. District Court was presented with the question of whether a crew member of a submarine with two crews was attached to a vessel for nonjudicial punishment purposes, even when he was ashore for an extended period of time due to normal crew rotation. Citing Jones v. Frudden, the Court held that the concept of being attached to a vessel remains valid in such circumstances to the same extent that a surface ship sailor is still attached to a vessel while in port. Bennett, 466 F.Supp. at 259.
The Court cited seven factors as persuasive: assignment orders showing the sailor’s official military address as the ship; the sail- or drawing submarine pay (but not sea pay while ashore) for the entire time he was attached to the ship; living expenses ashore were tax deductible while away from the ship, which was considered his permanent home; after a period of liberal leave, the crew engaged in intensive refresher training to prepare for the next patrol; all crew members were subject to instant recall if necessary for the ship’s mission; at no time was discipline exercised by a person other than the ship’s commanding officer; and, crew members were credited with sea duty for the entire time including that ashore. The Court held that the existence of two crews (one of which was ashore for an extended period of time while the other was aboard the submarine) did not in any way negate the burden on the commanding officer to maintain the efficiency and discipline necessary to ensure a high state of readiness in each crew. Id. at 260.
In the case before us, the defense counsel at trial objected to the admission of the NJP record because the ship “was not an operational vessel at the time it was in the yards here in Philadelphia____” Record at 41-42. When the military judge overruled the objection, counsel asked if the Court believed the ship was an operational vessel. *621 The military judge replied that her ruling was based on the lack of legal precedent and not on the operational status of the ship. Record at 42. After reviewing the briefs of the parties, this Court asked the Government to file a supplemental brief citing any additional authority for conceding the proposition that a ship of the United States Navy is not a “vessel” for the purpose of Article 15, if not in an operational status.
The Government, in its reply, cited Yatchak as its primary authority and argued that the U.S.Code definition of vessel and the decisions in Jones and Bennett are consistent with its position that a ship in long-term overhaul can be in an operational status. The Government again urged this Court to adopt a rule that the burden of proving the ship was not in an operational status should be on the party objecting to the admissibility of the record. We find there are several problems, however, in the position advocated by the Government.
We know of no generally accepted definition of the term “operational” as applied to United States Navy ships.[5] Furthermore, there is not, as far as we know, any sort of established procedure for administratively determining the operational status of naval vessels to which the parties may look for guidance.[6] Nor are we aware of any authoritative reference materials that would provide the parties in litigation a framework for legal analysis. We do not favor a rule of law that creates uncertainty and is likely to result in extensive litigation and inconsistent decisions.
There is, in addition, a broader implication to adopting such a rule. If records of NJP proceedings held aboard a ship not in an operational status are inadmissible at a subsequent proceeding unless the member was given an opportunity to consult with a lawyer, it follows that the member would have the right to refuse NJP. No regulations have been issued providing guidance to commanding officers and servicemembers as to when a servieemember attached to or embarked in a vessel may refuse NJP. Such regulations are expressly authorized and would presumably prevent a servieemember from suffering a punishment his or her commanding officer could not lawfully impose without the member’s .consent rather than placing the burden on the servieemember to suffer the punishment and attempt later to prove it was unlawful. See Article 15(a), UCMJ. We find the absence of such a regulation inexplicable in light of the Government’s position in this appeal.
The consequences, then, of accepting the Government’s argument and adopting a rule as to the admissibility of certain records of NJP extend far beyond the courtroom. We decline to judicially mandate such a sweeping change to Navy policy absent a clear and unequivocal legal requirement by our superi- or court to do so. We find the holding in Yatchak not to constitute such a mandate for two reasons. First, Yatchak involved the legality of bread and water as a court-martial punishment under Article 55, UCMJ. Second, the legal significance, if any, of the “operational status” of a Navy ship was not substantively addressed by the Court.
The Court’s opinion in Yatchak never discussed the “operational status” of the ship. Instead, the majority simply noted in its introductory paragraph that the Government and defense agreed the ship “was never in an operational status throughout the period of the appellant’s naval service.” Yatchak at 380. Judge Wiss, in his concurring opinion, expressly relied on the quoted language and expressly disassociated himself from the ma *622 jority opinion’s view of the legislative history. Judge Sullivan concurred in the result, citing United States v. Valead, 32 M.J. 122 (C.M.A 1991), on the grounds that “a bread and water sentence cannot be executed until approved by the convening authority.” 35 M.J. at 381 (Sullivan, C.J., concurring).
The following language from the majority opinion states the Court’s rationale:
After reviewing our prior decisions in Wappler and Volead and examining the legislative history of congressional concerns about the punishment of confinement on bread and water, we hold that appellant was not “attached to or embarked in a vessel,” as that phrase was used by Congress. Since the punishment was imposed and executed in circumstances where Congress intended that it be prohibited as “cruel or unusual,” we hold that confinement on bread and water in this case was prohibited by Article 55.
Yatchak, 35 M.J. at 381 (citing United States v. Wappler, 2 C.M.A 393, 9 C.M.R. 23 (1953)).[7] Thus, the major focus of the Court’s decision was on “congressional concerns about the punishment of confinement on bread and water” and only incidently, if at all, the operational status of the vessel. See 35 M.J. at 381 (Wiss, J., concurring).
We conclude that Yatchak, therefore, does not impose a clear and unequivocal legal requirement to judicially mandate a sweeping change to Navy policy concerning the imposition of nonjudicial punishment under Article 15, UCMJ. The term “operational status,” is undefined and has no statutory or regulatory basis to be used in deciding whether a U.S. Navy ship is a ‘Vessel” within the meaning of Article 15, UCMJ. In contrast, the term “vessel” is defined in the U.S.Code and that definition is prima facie evidence of the intent of Congress as to the meaning of the term in Article 15, UCMJ. Finally, the Navy’s interpretation of the term ‘Vessel” is entitled to substantial deference unless manifestly contrary to the intent of Congress. Cf. Davis v. United States, 495 U.S. 472, 484, 110 S.Ct. 2014, 2021, 109 L.Ed.2d 457 (1990) (holding that an agency’s interpretation and practices are given considerable weight where they involve the contemporaneous construction of a statute and where they have been in long use.)
Congress has provided a statutory definition of the term ‘Vessel” and entrusted the responsibility for making determinations regarding it to those who it believed would be best qualified and in the best position to obtain and evaluate information necessary for the administration of statutory and regulatory provisions concerning the classification of naval vessels. See 10 U.S.C. § 7304 (1988); U.S. Navy Regulations, art. 0406. The need for such a decision making process seems obvious to us. Without it, not only extended overhauls, but circumstances such as a casualty at sea due to severe weather, accidental grounding or collision — not to mention damage caused by enemy action in time of war — could render a ship not “operational” for disciplinary-purposes. Nothing in the legislative history suggests to us that Congress meant to alter the responsibility for command of a vessel in such a manner.
We hold that the operational status of a naval vessel is not relevant for the purpose of imposing NJP under Article 15(a), UCMJ, and that the status of a vessel is determined by the Secretary of the Navy and the Chief of Naval Operations in accordance with law and regulations applicable to classification of naval vessels. We specifically hold that a naval ship undergoing overhaul is a vessel at *623 all times without regard to its operational status until a determination is made to the contrary by competent authority. Accordingly, the findings and sentence as approved on review below, are affirmed.
Senior Judges McLAUGHLIN and ORR * concur.

. Whether the right to speak to an attorney is still a valid legal requirement is uncertain. This Court has held that it is not. United States v. Kelly, 41 MJ. 833 (N.M.Ct.Crim.App.1995). The U.S. Court of Appeals for the Armed Forces has decided to review that decision. United States v. Kelly, 43 MJ. 172 (1995) (order). The underlying right to refuse NJP, if not attached to or embarked in a vessel, is not at issue in Kelly.

. Congress has established a clear distinction between land-based and sea-based maritime *619 workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seaman. McDermott International, Inc. v. Wilander, 498 U.S. 337, 347, 111 S.Ct. 807, 813, 112 L.Ed.2d 866 (1990).

. We also observed, parenthetically, that such other fully operational ships as may come under the jurisdiction of the Department of the Navy in time of war should also be considered vessels for Article 15 purposes. Forester, 8 MJ. at 563. This Court has never said, nor do we say now, that the converse is true: that Navy ships lose their status as "vessels” for Article 15 purposes if they are not fully operational.

. Now the U.S. Court of Appeals for the Armed Forces.

. There is, however, an official list of the "Operating Forces of the Navy” published in Part 1 of the Standard Navy Distribution List, Office of the Chief of Naval Operations, NO9B22, 2000 Navy Pentagon, Washington, D.C. 20350-2000.

. There is a Naval Vessel Register/Ships Data Book published by the Naval Sea Systems Command, Department of the Navy, Washington, D.C. 20362. Chapter 663 of the U.S.Code, Naval Vessels, contains several provisions relating to the classification, examination for fitness, and striking from the Naval Vessel Register of vessels of the U.S. Navy. An earlier version of 10 U.S.C. § 7304 provided that a vessel unfit for service, or "an unfinished vessel in any naval shipyard that cannot be finished without disproportionate expense," shall be stricken from the Register by the Secretary of the Navy. 10 U.S.C. § 7304 (1988). The current version still refers to “unfinished vessels."

. Wappler held, in pertinent part, that confinement on bread and water may only be imposed on an accused “attached to or embarked in a vessel." Valead held that this Court acted lawfully in setting aside 3 days’ confinement on bread and water and not mitigating some other aspect of the sentence even though that punishment had already been served. Neither opinion addressed the operational status of a naval ves *623 sel. In fact, Wappler did not involve a vessel at all.

 Senior Judge Orr participated prior to his retirement on 31 August 1995.